ERIK STRINDBERG (Bar No.8905)
T. GUY HALLAM, JR. (Bar No. 6101)
ERIKA BIRCH (Bar No.7831)
**STRINDBERG & SCHOLNICK, LLC**
802 W. BANNOCK STREET, SUITE 308
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erik@utahjobjustice.com
guy@idahojobjustice.com
erika@idahojobjustice.com

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

---

| | |
|---|---|
| **OREGON-IDAHO UTILITIES, INC., an Oregon Corporation, and MEDIASNAP SOLUTIONS, LLC, a Delaware limited liability company**<br><br>        Plaintiffs,<br><br>vs.<br><br>**SKITTER CABLE TV, INC., a Georgia Corporation, SKITTER, INC., a Georgia Corporation, GALVA CABLE COMPANY, LLC, a Georgia limited liability company, SOUTHEAST CONTENT GROUP, LLC, a Georgia limited liability company, TBM CONTENT PARTNERS, LLC, a Georgia limited liability company, VIDEO 6 LLC, a Missouri limited liability company, KINGDOM TELEPHONE COMPANY, a Missouri telephone corporation, and ROBERT SAUNDERS, an individual.**<br><br>        Defendants. | **COMPLAINT**<br>**(JURY DEMANDED)**<br><br><br>Civil No. 1:16-cv-228<br><br>Judge _____ |

Plaintiffs Oregon-Idaho Utilities, Inc., an Oregon Corporation and MediaSnap Solutions LLC, a Delaware limited liability company, by and through their attorneys of record, the firm of Strindberg & Scholnick LLC, hereby complain and allege against Defendants as follows:

## I.      PARTIES

1.      Defendant Skitter Cable TV, Inc. (hereinafter "Skitter Cable TV") is a corporation in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 11050552.  Defendant Skitter Cable TV, Inc. was formerly known as Skitter Technologies, Inc. until September 24, 2014, when the corporate name was changed. Defendant Skitter Cable TV is a wholly-owned subsidiary of Defendant Skitter, Inc.

2.      Defendant Skitter, Inc. ("Skitter, Inc.") is a corporation in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 09013778 and is the parent corporation of Defendant Skitter Cable TV.

3.      Defendant Galva Cable Company, LLC ("Galva Cable") is a limited liability company in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 12100421. Defendant Galva Cable Company, LLC is a subsidiary of Skitter, Inc.  Skitter, Inc. is the managing partner of Defendant Galva Cable Company, LLC.

4.      Defendant Southeast Content Group, LLC ("Southeast Content Group") is a limited liability company in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 11050547.

5.      Defendant TBM Content Partners, LLC ("TBM Content Partners ") is a limited liability company in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 12017422.

6.      Defendant Video 6, LLC ("Video 6") is a limited liability company in the State of Missouri, duly organized pursuant to Missouri state law, Missouri Secretary of State Charter No. LC1337131.

7.      Defendant Kingdom Telephone Company ("Kingdom Telephone Co.") is a Missouri telephone corporation, duly organized pursuant to Missouri law, Missouri Secretary of State Charter No. T00000602.

8.      Defendant Robert Saunders is an individual and Chief Executive Officer of Defendant Skitter Cable TV, Inc., Chief Executive Officer of Defendant Skitter, Inc., and, based upon information and belief, serves in various officer, member, or leadership capacities for Defendants TBM Content Partners, LLC, Defendant Southeast Content Group, LLC, Defendant Galva Cable Company, LLC, and Video 6, LLC.  Based upon information and belief, Mr. Saunders resides in or near Atlanta, Georgia.

9.      Plaintiff Oregon-Idaho Utilities, Inc. ("OIU") is an Oregon corporation, duly organized pursuant to Oregon state law, Oregon Secretary of State, Corporation Division Registry No. 138239-84. Plaintiff Oregon-Idaho Utilities, Inc. is duly authorized to transact business in the State of Idaho, pursuant to a Certificate of Authority, Idaho Secretary of State No. C88710.

10.     Plaintiff MediaSnap Solutions LLC ("MediaSnap") is a limited liability company in the State of Delaware, duly organized pursuant to Delaware state law, Delaware Department of State, Division of Corporations No. 5174595.

### III.      JURISDICTION AND VENUE

11.      This Court has original jurisdiction under the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964. with respect to Plaintiffs' RICO claim arising under federal law. Further, this Court has original jurisdiction based upon diversity under

28 U.S.C. §1332.  The amount in controversy exceeds the minimum requirements of 28 U.S.C. §1332.

12.     Venue is proper with this Court as Plaintiffs OIU and MediaSnap are franchisees pursuant to a franchise agreement with Skitter Cable TV, pursuant to Idaho Code §29-110, with the area of the franchise within Idaho.  The principal place of business for Plaintiffs OIU and MediaSnap is Nampa, Idaho.

## IV.     CONSPIRATORIAL LIABILITY

13.     Defendant Robert Saunders is individually liable for his acts and those of the co-conspirator Defendants, whether named or unnamed, committed in furtherance of the conspiracies described herein.

14.     Defendant Robert Saunders is individually liable as an aider and abettor of the acts of the co-conspirator Defendants, whether named or unnamed, committed in furtherance of the conspiracies described herein.

15.     Defendant Robert Saunders was a member of or associated with and directly or indirectly controlled, or participated in the control of, the racketeering enterprise described in this Complaint through the pattern of racketeering activity described herein.

16.     Defendant Robert Saunders conspired with the co-conspirator Defendants to conduct or participate in the conduct of one or more of the racketeering enterprises described in this Complaint through the pattern of racketeering activity described herein.

17.     The Defendants are jointly and severally liable for the damages alleged in this Complaint.

*/// /// ///*

COMPLAINT AND DEMAND FOR JURY TRIAL - 4

## GENERAL ALLEGATIONS AND FACTS COMMON TO ALL COUNTS

18.     OIU is a provider of telephone public utility services in parts of Oregon and Idaho. OIU's business is founded upon connecting the rural communities of Idaho, Oregon and Nevada with reliable, high quality, telecommunication services.

19.     Since it began service in 1990, OIU has modernized telecommunication facilities in eastern Oregon and throughout its service area in Idaho.

20.     In 1995 OIU expanded its operations area to include additional exchanges in Humboldt County, Nevada and additional areas of service in Oregon.

21.     In 2007, OIU began offering broadband DSL in its service areas in Idaho, Oregon, and Nevada.

22.     In 2012, OIU began to consider options for offering its rural customer base internet TV services.

23.     In April, 2012, Skitter Cable TV represented that Skitter Cable TV had a working platform which, if OIU became a franchisee of Skitter Cable TV, would enable OIU to provide its customers with a full television channel line-up, including local and satellite channels (hereinafter the "Product"), through an inexpensive Roku or Western Digital set-top box.

24.     Skitter Cable TV described the Product as a simple, inexpensive niche television and internet product which would be easy to market to OIU's existing customer and subscriber base.

25.     Skitter Cable TV represented that the Product would deliver tailored television content, which could be bundled in a manner specific to each individual customer, along with additional internet content through the inexpensive set-top box.

26.     Skitter Cable TV further represented to OIU that the service would require minimal capital expenditures by OIU, and Skitter Cable TV would be solely responsible for providing the content.

27.    Defendant Robert Saunders commented that "television is too expensive for telephone companies to do," unless done "the Skitter way."

28.    The simple, inexpensive niche television and internet product was important to OIU as it would allow OIU to differentiate the Product when marketing to OIU's customer and subscriber base.

29.    Skitter Cable TV represented that it would ensure a "quickstart" for the installation process and delivery of content and services, within ninety days of execution of the Franchise Agreement, Plaintiffs would be able to begin selling the subscription services to Plaintiffs' customers and subscriber base.

30.    Defendant Robert Saunders encouraged OIU to purchase franchise rights to three Designated Market Areas ("DMAs"): Boise, Salt Lake City, and Reno-Carson.

31.    When questioned about why OIU would invest such a significant amount of money in DMAs such as Salt Lake City and Reno-Carson, where OIU's customer base was small, Robert Saunders represented to OIU that the biggest benefit to OIU in purchasing those DMAs would be the significant revenue stream from the DMA resale program in those DMAs.

32.    On or about April 25, 2012, Skitter Cable TV provided OIU with a Franchise Disclosure Document as required by federal law (the "Franchise Disclosure Document").

33.    The Franchise Disclosure Document represented for an initial franchise fee of $225,000.00, Skitter Cable TV would: "deliver to your location the equipment you need in order to broadcast television content to your customer."

34.    The Franchise Disclosure Document also confirmed prior representations by Skitter Cable TV that "there are 2 different manufacturers of set top boxes that are used for video delivery," the $100.00 Roku and Western Digital boxes.

35.     The representations in the Franchise Disclosure Document were false as Skitter Cable TV was unable to deliver content to the set top boxes in the manner promised.

36.     The Franchise Disclosure Document also stated that the "initial startup phase … may be 12 months" for the delivery of satellite services but Skitter Cable TV specifically informed OIU that Skitter Cable TV "had seen" the implementation of satellite services happen much quicker than the 12-month period mentioned in the Franchise Disclosure Document.

37.     The Franchise Disclosure Document contained a representation that forty (40) new franchised outlets were projected in the next fiscal year.  Although it had no basis in fact, the projection of new franchised outlets contained in the Franchise Disclosure Document was consistent with the other representations made by Skitter Cable TV that the proven product line would lead to significant growth and business opportunities for franchisees.

38.     The Franchise Disclosure Document was required by federal law to include copies of specific financial documents and disclosures for Skitter Cable TV and Skitter, Inc.  Skitter Cable TV failed to comply with this federal requirement.  Further, the "Financial Statements" attached to the Franchise Disclosure Document as Exhibit "B" were false or materially inaccurate, as they appear to have overstated the company's cash flow and financial stability, among other things.

39.     Defendants failed to properly update the Franchise Disclosure Document as required by federal law and failed to disclose material adverse financial events.

40.     After receipt of the Franchise Disclosure Document, OIU and Skitter Cable TV had additional discussions regarding the potential franchise.

41.     On April 26, 2012, Scott Remillard, Vice President of Sales for Skitter, Inc., at the request of Defendant Robert Saunders, provided a presentation to OIU regarding the expected future financial performance of the Skitter products for franchisees.  The April 26, 2012 presentation

included a phone conference between Mr. Remillard and OIU, along with a webinar related to the DMA resale program.

42.     During the April 26, 2012 presentation, Mr. Remillard confirmed earlier representations that the Product would fit the niche that OIU was looking to fill, at "very low risk and start-up" costs to OIU. Mr. Remillard specifically described the benefits of becoming a franchisee and confirmed Mr. Saunders earlier representations that franchisees would have access to the lucrative DMA resale program within the respective DMAs.

43.     Mr. Remillard also presented market research completed by Skitter, Inc. which purported to identify the size of the prospective customer base within the Boise, Salt Lake City, and Reno-Carson DMAs, a "conservative" percentage of the number of customers within the DMAs who would purchase the Product over a three (3) year period, and the cost and revenue associated with the DMA resale program.

44.     Mr. Remillard represented, based upon Skitter, Inc.'s "conservative" estimate of sales to five percent (5%) of the customer-base, the projected revenues for the three DMAs were as follows:

     a.     Boise DMA - $28,914.80 ("total profit margin per month");

     b.     Salt Lake City DMA - $208,000.85 ("total profit margin per month"); and

     c.     Reno-Carson DMA - $60,776.24 ("total profit margin per month").

45.     Mr. Remillard made these representations orally and also had a series of slides as part of the webinar which showed the projected revenues to OIU, as the service provider, in those DMAs.

46.     Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. informed OIU that the DMA resale program to the Boise, Salt Lake City, and Reno-Carson DMAs was included as part

of the franchise, would be implemented after OIU executed a franchise agreement, and the income from DMA resale would "pay for" the initial franchise fee.

47.    Skitter, Inc. knew that these representations regarding costs and financial performance were false and were made to induce Plaintiffs to enter into a Franchise Agreement and purchase the Boise, Salt Lake City and Reno-Carson DMAs.

48.    On or about April 30, 2012, Skitter Cable TV sent OIU a copy of the Franchise Agreement.

49.    Prior to executing the Franchise Agreement, OIU had a series of communications with Defendant Robert Saunders and other representatives of Skitter Cable TV to get specific information about the terms and conditions of the Franchise Agreement, the Boise, Salt Lake City, and Reno-Carson DMAs, and the associated DMA resale program in those areas.

50.    During these conversations, Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. failed to disclose that there were significant ongoing legal issues associated with the Product, the DMA resale program, and Skitter Cable TV's ability to provide the services and equipment as represented.

51.    Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. made these material misrepresentations and omissions to induce Plaintiffs to become a franchisee, although these Defendants knew, or should have known, they could not provide the services, equipment, or content as required by the Franchise Agreement.

52.    Based on these misrepresentations and omissions, on June 5, 2012, OIU executed the Franchise Agreement.  Attached hereto as Exhibit "A" is a true and correct copy of the Franchise Agreement.

53.    On June 6, 2012, OIU caused a wire transfer of $295,000.00 to Skitter Cable TV as required by the Franchise Agreement.

54.     The $295,000.00 TV included an initial franchise fee of $225,000.00 which covered the Boise, Idaho DMA, along with an additional $70,000.00 for the two additional DMAs in Salt Lake City, Utah, and Reno, Nevada.

55.     As part of the Franchise Agreement, Plaintiffs were also required to invest one dollar ($1.00) in Southeast Content Group LLC and TBM Content Partners.

56.     In return for this mandatory "investment," Plaintiffs received an ownership interest in both Southeast Content Group and TBM Content Providers.

57.     The Franchise Agreement states that "Ownership in each LLC provides rights to the Franchisee to receive broadcast television and premium television content as described in Exhibit 'B' [to the Franchise Agreement]."

58.     As part of the Franchise Agreement, Skitter Cable TV represented and warranted that, among other things, it:

    a.     had "full power and authority to undertake the obligations set forth in [the Franchise Agreement]…"

    b.     [s]hall comply in all respects with all applicable laws and regulations affecting the subject matter [of the Franchise Agreement];

    c.     [o]wns or otherwise possesses sufficient rights in the products, equipment, content and licensed software as required to perform and provide the Skitter services under [the Franchise Agreement] and for the video service to be displayed, accessed, and/or utilized in the manner contemplated by [the Franchise Agreement], including Franchisee's distribution of Skitter TV channels to end users in the Franchise Zone without liability to any content owner or third party…

59.     In exchange for the payments made by Plaintiffs as consideration for the Franchise Agreement, Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners were to provide products, equipment, content and marketing necessary for the Plaintiffs to sell local and satellite television packages to Plaintiffs' customers and subscribers, along with the DMA resale program.

60.     These representations and warranties contained in the Franchise Agreement were false because Skitter Cable TV did not own or possess sufficient rights in the products, equipment, and content to perform its duties under the Franchise Agreement.  The Product did not work.

61.     Plaintiffs were not aware that the representations and warranties made by Skitter Cable TV in the Franchise Agreement were false.

62.     On June 6, 2012, OIU assigned to MediaSnap its rights and obligations under the Franchise Agreement. MediaSnap is a separate entity, sharing common ownership with OIU, which was formed specifically for the purpose of operating the franchise.

63.     After executing the Franchise Agreement, Plaintiffs begin to purchase the equipment required by Defendants Skitter Cable TV and Skitter, Inc. in order to complete the "Quickstart" so that they could begin marketing the television services to customers.

64.     Plaintiffs purchased a number of Roku set-top boxes and Western Digital equipment which Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. had represented would be used to deliver the Product to customers.  Plaintiffs also began working to form relationships with third-party vendors in order to assist with the represented and expected volume of customer subscriptions.

65.     In late June or early July 2012, Defendant Robert Saunders first informed Plaintiffs that DMA resale could not "currently" be implemented, despite prior representations by Defendants

Robert Saunders, Skitter Cable TV, and Skitter, Inc. to the contrary, because of issues in another DMA.  Defendant Robert Saunders further stated that he was "confident" that the DMA resale service would be available "soon."

66.     Between June 2012 and December 2012, Plaintiffs attempted to order and secure the equipment necessary to implement the "Quickstart" promised by Skitter Cable TV.  Plaintiffs expenses included costs for head end equipment and preparations of their facility for installation of the equipment. Plaintiffs expended significant funds in order to get the necessary equipment to Plaintiffs' facilities, get the equipment installed, and aligned before weather impacted the process.

67.     Between June 2012 and December 2012, Defendants failed to provide the services, equipment, and content as required by the Franchise Agreement and specifically failed to provide the promised ability to market the Product within ninety (90) days of execution of the Franchise Agreement.

68.     On or about February, 2013, Skitter, Inc. solicited Plaintiffs and other third-parties to be part of a "private placement" of stock in Skitter, Inc.  The "private placement" offering contained financial and other information which was inconsistent with the prior Franchise Disclosure Document.

69.     Skitter, Inc. represented that this private placement would allow it to deploy OIU's services in April, 2013.

70.     The February 2013 private placement solicitation requested an investment of five million dollars ($5,000,000.00) in exchange for a ten percent (10%) ownership in Skitter, Inc., and further stated that "a portion of proceeds from this Offering will be used to secure equipment, software and installation of planned deployments."

71.     Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. failed to disclose that despite Plaintiffs' initial $295,000 payment, they had not yet secured the equipment or software necessary for the deployment of services or content in Plaintiffs' DMAs.

72.     On or about February 27, 2013, Defendant Robert Saunders contacted Plaintiffs and requested $145,000.00 in additional funds to procure the remaining equipment that Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. were to provide as part their duties under the Franchise Agreement.

73.     On or about March 5, 2013, Defendant Robert Saunders contacted Plaintiffs and provided a list of equipment that Defendants Skitter Cable TV and Skitter, Inc. needed to purchase as part of their duties under the Franchise Agreement and requested $78,000.00 in additional funds from Plaintiffs in order for Defendants Skitter Cable TV and Skitter, Inc. to do so.

74.     On March 5, 2013, Plaintiffs refused to provide the additional funds requested by Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. and declined to take part in Defendants' private placement solicitation.

75.     Based upon information and belief, after Plaintiffs declined Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc.'s various solicitations for additional funds, Defendants began prioritizing other franchisees over Plaintiffs.  Plaintiffs were later informed by a former high ranking employee of Defendants Skitter Cable TV and Skitter, Inc. that Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. put Plaintiffs' franchise "at the back of the line" for delivery of equipment and services.

76.     On or about May 1, 2013, Defendant Robert Saunders contacted Plaintiffs and suggested that Defendants could deliver the content to MediaSnap via fiber optic connection instead of using

the satellite deployment that Plaintiffs had already constructed in accord with the Franchise Agreement and Defendants' prior representations and instructions.

77.    By this time, OIU and MediaSnap had already expended in excess of $45,000.00 to purchase and install equipment to enable it to provide the Product to its customer and subscriber base.

78.    On May 30, 2013, Defendants Robert Saunders, Skitter Cable TV, and Skitter, Inc. informed Plaintiffs that Defendants had failed to perform the contract because of financial issues.

79.    Defendants failed to properly disclose their financial condition and to properly disclose materially adverse financial events.

80.    In June, 2013, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners acknowledged, orally and in writing, that they had not delivered to Plaintiffs the necessary content licensing and equipment as required by the Franchise Agreement.

81.    Skitter Cable TV thereafter in writing expressly waived its right to terminate the Franchise Agreement under Section 3(b) contained therein.  Skitter Cable TV further agreed that in the event it failed to deliver all necessary content licensing and equipment to Plaintiffs on or before "three (3) months prior to June 6, 2014," Plaintiffs would be entitled to terminate the relationship upon written notice.

82.    On June 6, 2013, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners informed Plaintiffs that they might not be able to provide west coast channel feeds to Plaintiffs' subscriber base despite prior representations to the contrary.

83.     On or about June 18, 2013, Kingdom Telephone Co. organized a meeting of franchisees to solicit additional funds for the benefit of Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners.

84.     In June 2013, Kingdom Telephone Co. solicited Plaintiffs to make additional payments in order for Skitter, Inc. and Skitter Cable TV to "make payroll."  These payments were not required by the Franchise Agreement.

85.     Based upon information and belief, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners promised that this additional payment was a loan and would be repaid by these Defendants.

86.     Based upon information and belief, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners failed to disclose that for some period of time, they had failed to pay vendors and service providers who were necessary if Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners were to perform under the Franchise Agreement.

87.     On or about June 26, 2013, MediaSnap made a wire transfer in the amount of $4,500.00 to Defendant Kingdom Telephone, to assist Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners to "make payroll."

88.     Based upon information and belief, as part of the ongoing attempts by Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners to seek additional payments from Plaintiffs and other franchisees and

business entities, these Defendants provided grossly overstated and false revenue projections for their ongoing operations.

89.     On or about June 26, 2013, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners for the first time informed Plaintiffs that a different "set top box" will be required for Plaintiffs' customers and subscribers to receive satellite channels through the Skitter Cable TV service.  This change in equipment added significant cost and hurdles to Plaintiffs' ability to market the Skitter Cable TV service, effectively changing the Product from a simple, inexpensive niche television and internet product to a more typical, and not cost-effective cable television offering.

90.     In June 2013, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners again acknowledged that they had failed to deliver equipment and content as required by the Franchise Agreement.

91.     On or about July 12, 2013, Kingdom Telephone again solicited Plaintiffs and other franchisees to make additional payments for the benefit of Defendants.  These payments were not required by the Franchise Agreement.

92.     Plaintiffs declined to make any additional payments.

93.     Based upon information and belief, in approximately August 2013, Kingdom Telephone Co. and other franchisees and third-parties formed Video 6.

94.     Prior to the formation of Video 6, Kingdom Telephone represented to Plaintiffs that Video 6 would be responsible for managing the ongoing operations of Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners and solicited Plaintiffs to participate in the Video 6 joint venture.

95.     Plaintiffs decided not to participate in the Video 6 joint venture or to make additional payments for the benefit of Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners or Video 6.

96.     Based upon information and belief, Video 6 has been participating in the management, communications, and decision-making of Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners since its formation.

97.     Based upon information and belief, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, and TBM Content Partners used the $295,000.00 paid by Plaintiffs to purchase equipment that they then used for the benefit of other franchisees or for Defendants' own use.

98.     On or about October 30, 2013, Defendants informed Plaintiffs that the service would not be available until January 2014.  Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 proposed an incomplete Product for partial launch by MediaSnap but these Defendants did not have the ability to provide the Product or content pursuant to the Franchise Agreement.

99.     On or about November 9, 2013, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 again informed Plaintiffs that they were unable to secure content providers as promised to Plaintiffs.

100.    On or about December 6, 2013, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 again moved the "launch date" to February, 2014.  Notwithstanding this representation, it is believed

that Defendants still did not have the ability to provide the Product, content or the equipment required by the Franchise Agreement.

101.    On or about February 25, 2014, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 notified Plaintiffs that they would no longer be able to provide its product using satellite equipment and thereafter the services would only be available through fiber optic cable.   Based upon information and belief, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 knew of this fact a significant amount of time prior to informing Plaintiffs.

102.    On February 28, 2014, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 informed Plaintiffs that Defendants would be required to build a different type of "head end" equipment at the Plaintiffs' facility in order to restore access to content which was to be provided by Defendants. This new requirement further moved the "launch date" for Plaintiffs "to be determined" at some future date.

103.    On or about March 27, 2014, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 notified Plaintiffs that the necessary equipment would ship in approximately May, 2014, with a target "launch date" for services of July 1, 2014.

104.    On or about June 26, 2014, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 notified Plaintiffs that they intended to ship the necessary equipment to Plaintiffs in approximately July, 2014, with a new target "launch date" for services of September 2014.

105.    On or about July 24, 2014, Plaintiffs received a partial shipment of the new "head end" equipment from Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6, and completed installation of this portion of the equipment on September 15, 2014.

106.    However, between September and December, 2014, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 informed Plaintiffs that they were converting to a different server which would require yet another change of equipment at Plaintiffs' facility. During this time, a new server was shipped, installed and powered up. These additional equipment changes forced the "launch date" to be moved to February 2015.

107.    Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 were still unable to meet the February 2015 "launch date" and in late May, 2015 said that service would begin on June 1, 2015.

108.    On or about June 18, 2015, Plaintiffs were able to "soft" launch services, and on June 30, 2015, Plaintiffs activated their first account in Oregon.

109.    On July 23, 2015, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 declared that Plaintiffs have officially "launched" Skitter Cable TV services, over three years after the Franchise Agreement was executed.

110.    However, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 were still unable to provide the equipment, content, and services in all three of Plaintiffs' DMAs.  Rather, these Defendants were only able to provide limited, unstable services in the Boise DMA area.

COMPLAINT AND DEMAND FOR JURY TRIAL - 19

111.    Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6's failure to launch services in all three DMAs has left Plaintiffs unable to market the services to over fifty percent (50%) of Plaintiffs' customers.

112.    Despite Defendants' failure to properly provide the equipment, content, and services required by the Franchise Agreement, Defendant Galva Cable Co. continued to invoice Plaintiffs for content.

113.    On January 1, 2016, Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 allowed their contract with AMC television networks to expire.  These Defendants informed Plaintiffs that the content was too expensive so Defendants are not renewing those contracts.  Several additional channels subsequently also "go dark," adding to the significant amount of content which the Franchise Agreement required but which was not provided.

114.    In February 2016 Defendant Robert Saunders contacted Plaintiffs and requested that Plaintiffs remove the "head end" equipment and ship it back to Defendants. When Plaintiffs objected, Defendant Robert Saunders informed Plaintiffs that Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 no longer operate in the way that they did when the Franchise Agreement was executed. In short, these Defendants no longer provide the inexpensive, niche Product which was sold to Plaintiffs as part of the Franchise Agreement. Instead, it appeared these Defendants were going to operate like a cable company. Defendant Robert Saunders further suggested that Plaintiffs should pursue alternate, more expensive, methods to secure the content into Plaintiffs' DMAs as Defendants

Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 would no longer provide the services as outlined in the Franchise Agreement.

115.    Even though Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 failed to perform their obligations under the Franchise Agreement, on or about April 6, 2016, Defendant Robert Saunders sent Plaintiffs a letter which purported to terminate the Franchise Agreement.

116.    This "termination" letter stated that "Skitter is terminating the Agreement pursuant to the terms of Section 15(a)(i) of the Agreement (failure to launch within one year) effective immediately" even though Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 were solely responsible for the failures of the Product.

117.    On or about May 1, 2016 Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Company, Southeast Content Group, TBM Content Partners and Video 6 shut off all services without additional notice to Plaintiffs.

118.    On May 1, 2016, Plaintiffs believed that the Skitter Cable TV services and content had again failed and submitted a number of "trouble tickets" in an effort to get the service working.

119.    On May 2, 2016 Defendant Robert Saunders contacted Plaintiffs and informed Plaintiffs that the IPTV services were not working because Defendants "shut it down."

120.    Skitter Cable TV has, to date, failed to deliver all necessary content licensing and equipment to Plaintiffs.

121.    Plaintiffs have not been repaid the $4,500.00 by Defendants.

122.    The Defendants used the U.S. mail system and interstate communications wires in furtherance of their scheme to defraud the Plaintiffs.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

123.    Plaintiffs hereby allege and incorporate by reference all of the paragraphs and allegations set forth above.

124.    The Franchise Agreement was a contract between Plaintiffs and Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, TBM Content Partners.

125.    Plaintiffs provided consideration for the Franchise Agreement through the payment of $295,000.00 to these Defendants.

126.    In exchange for the consideration, Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners were to provide products, equipment, content, and software necessary for Plaintiffs to sell local and satellite television packages to Plaintiffs' customers and subscribers.

127.    Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners breached the terms and conditions of the Franchise Agreement by, among other things:

   a.    Failing to have full power and authority to undertake the obligations in the Franchise Agreement;

   b.    Failing to comply in all respects with applicable laws and regulations affecting the subject matter of the Franchise Agreement;

   c.    Failing to own or otherwise possess the products, equipment, content and software required to perform under the Franchise Agreement;

   d.    Failing to use the consideration paid by Plaintiffs to purchase the equipment necessary to launch the services to Plaintiffs' customer base;

   e.    Failing to provide the Product as required by the Franchise Agreement;

f.      By changing the business model from what was sold to Plaintiffs pursuant to the Franchise Agreement, with inexpensive set-top boxes, to a more expensive and less marketable product;

g.      By failing to provide equipment which functioned properly or which was capable of providing the satellite and other services to Plaintiffs' customers;

h.      Failing to provide the services they were required to provide the Franchise Agreement;

i.      Failing to launch the services which were the subject of the Franchise Agreement within a reasonable time or as otherwise required by the Franchise Agreement;

j.      Failing to market the Product in Plaintiffs' DMAs;

k.      Failing to provide equipment and failing to launch the services in each of the DMAs sold to Plaintiffs;

l.      Failing to provide content required under the Franchise Agreement; and

m.      Improperly terminating the Franchise Agreement.

128.    The breaches of the Franchise Agreement have caused damage to Plaintiffs.

129.    The conduct of Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners was willful and intentional, malicious, and exhibits reckless or callous indifference to Plaintiffs.

130.    Plaintiffs have been damaged in amount to be proven at trial, but that amount exceeds $75,000.00.  Plaintiffs are further entitled to all available relief, including actual and compensatory damages, as well as costs and attorney fees.

131.    The Franchise Agreement is a commercial transaction, as that term is defined by Idaho law, and therefore Plaintiffs are entitled to recover their attorney fees and costs pursuant to Idaho Code §12-120(3), along with other applicable provisions of Idaho and federal law.

**SECOND CLAIM FOR RELIEF**
**(Fraud)**

132.    Plaintiffs hereby allege and incorporate by reference all of the paragraphs and allegations set forth above.

133.    The Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners made various misrepresentations of fact and false statements in the course of their dealings with OIU and MediaSnap, including, but not limited to, the following:

a.    The ongoing representations by Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that Skitter Cable TV was able to provide a full channel line-up through its existing system.

b.    The ongoing representations by Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that Skitter Cable TV was able to provide equipment necessary to allow Plaintiffs to provide IPTV and other services to Plaintiffs' customers.

c.    The ongoing representations by Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that Plaintiffs would be able to "Quickstart" the services so within ninety (90) days of execution of the Franchise Agreement that Plaintiffs' would be able to begin sale of services to Plaintiffs' customers.

    d.      The ongoing representations by Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that Plaintiffs would be able to benefit from DMA resale within the three DMAs of Plaintiffs' Franchise Agreement.

    e.      The ongoing representations by Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that DMA resale within the three DMAs of Plaintiffs' Franchise Agreement would conservatively provide a profit margin to Plaintiffs in the amount of $297,691.89 per month.

    f.      The representations by Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that DMA resale would pay for the amount paid by Plaintiffs for the Franchise Agreement;

    g.      The ongoing representations by Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that these Defendants were financially viable.

    h.      The representations by Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that Plaintiffs' initial payments for purchasing the franchise in the three DMAs would be used to provide equipment necessary to launch services for Plaintiffs.

    i.      The representations by Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that the information contained in the franchise disclosure documents was accurate.

j.      The representations by Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that Plaintiffs would be able to launch services to Plaintiffs' customers and subscriber base.

k.      The representations by Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that Plaintiffs would be able to launch services on a ROKU or Western Digital "set top box" which would allow delivery of content to Plaintiffs' customers and subscriber base.

l.      The ongoing representations by Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that Skitter Cable TV would be able to provide the content and channels identified in the Franchise Agreement.

m.      The representations by Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners that the equipment and content packages which were to be sold by Plaintiffs to their customer and subscriber base would be inexpensive and cost effective.

n.      The representations by Defendants that Plaintiffs would be repaid the $4,500.00 in additional funds which were solicited from Plaintiffs as a "loan" for Defendants ongoing operations.

134.    Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners induced Plaintiffs to enter the Franchise Agreement and pay the consideration by promising that these Defendants would provide equipment, services, and content consistent with the Franchise Agreement, which Defendants knew they could never provide and in fact did not provide.

135.   The Defendants knew at the time they made them, that the statements and misrepresentations identified herein were false.

136.   The Defendants' conduct as identified herein was ongoing over the course of the Defendants' relationship with Plaintiffs.

137.   The Defendants intended that Plaintiffs rely upon the statements and misrepresentations made by the Defendants.

138.   Plaintiffs were ignorant of the falsity of the statements and misrepresentations made by Defendants.

139.   The Plaintiffs reliance on the statements and misrepresentations of Defendants was justifiable and reasonable.

140.   Plaintiffs have suffered damages as a result of the statements and misrepresentations made by Defendants.

141.   Plaintiffs have been damaged in amount to be proven at trial, but that amount exceeds $75,000.00.  Plaintiffs are further entitled to all available relief, including actual and compensatory damages, as well as costs and attorney fees.

### THIRD CLAIM FOR RELIEF
### (Tortious Interference with Contract)

142.   Plaintiffs hereby allege and incorporate by reference all of the paragraphs and allegations set forth above.

143.   The Franchise Agreement was a valid contract between Plaintiffs and Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners.

144.   Defendant Video 6 had knowledge of the Franchise Agreement and its terms and conditions.

145.    Defendant Video 6 intentionally interfered with the Franchise Agreement and in the business relationship between Plaintiffs and Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners by directing Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners to change, alter, or otherwise violate the terms and conditions of the Franchise Agreement.

146.    Defendant Video 6's intentional interference with the Franchise Agreement caused a breach of the contract.

147.    Plaintiffs were damaged and injured as a result of the breach of the Franchise Agreement.

148.    Plaintiffs have been damaged in amount to be proven at trial, but that amount exceeds $75,000.00.  Plaintiffs are further entitled to all available relief, including actual and compensatory damages, as well as costs and attorney fees.

149.    The Franchise Agreement is a commercial transaction, as that term is defined by Idaho law, and therefore Plaintiffs are entitled to recover their attorney fees and costs pursuant to Idaho Code §12-120(3), along with other applicable provisions of Idaho and federal law.

## FOURTH CLAIM FOR RELIEF
### (Breach of Covenant of Good Faith Fair Dealing)

150.    Plaintiffs hereby allege and incorporate by reference all of the paragraphs and allegations set forth above.

151.    The Franchise Agreement is a contract between Plaintiffs and Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners.

152.    Implied in this contract is a covenant of good faith and fair dealing.

153.    The Defendants Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners interfered with the contract through their unlawful acts and then

wrongfully terminated the agreement. The Defendants' actions in doing so, and as alleged herein, violated the covenant of good faith and fair dealing.

154. Plaintiffs have suffered damages in an amount to be proven at trial, in additional to attorneys' fees and costs as a result of Defendants' breaches of the covenant.

**FIFTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

155. Plaintiffs hereby allege and incorporate by reference all of the paragraphs and allegations set forth above.

156. Plaintiffs provided a benefit to Defendants when Plaintiffs paid $4,500.00 to Defendant Kingdom Telephone Company.

157. The Defendants, or some of them, accepted the benefit of the $4,500.00 paid by Plaintiffs.

158. Under the circumstances of this matter, it would be unjust for Defendants to retain the benefits of the $4,500.00 without compensating Plaintiffs for the value received.

**SIXTH CLAIM FOR RELIEF**
**(RACKETEERING – IDAHO CODE §18-7804)**

159. Plaintiffs hereby allege and incorporate by reference all of the paragraphs and allegations set forth above.

160. The Plaintiffs are persons as the term is defined in Idaho Code §18-7803(b).

161. The Defendants are persons as the term is defined in Idaho Code §18-7803(b).

162. The Defendants were members of and/or associated with the racketeering enterprise, the activities of which occurred within and affected interstate commerce.  Each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs by managing or participating in the operation of the enterprise through the previously described pattern of racketeering activities in violation of Idaho Code §§18-7804(a), (b), and (c).

163.    The Defendants conspired together and/or with others to conduct or participate directly or indirectly, in the conduct of the enterprise's affairs, which were in or affected interstate commerce, through the previously described pattern of racketeering activity in violation of Idaho Code §18-7804(d).

164.    The Defendants' conduct, as identified herein, was unlawful, fraudulent, and engaged in the interstate transportation of stolen property by knowing causing and inducing the wiring of Plaintiffs' funds across state lines to Defendants' bank.   Defendants further used interstate communications to make false representations as outlined herein to Plaintiffs and to perpetrate fraud upon Plaintiffs.   Defendants used this scheme, or a similar scheme, to defraud other companies and franchisees.

165.    As a direct and proximate result of the Defendants' violations of Idaho Code §18-7804, Plaintiffs were damaged in their business and property interests in an amount to be determined at trial, but which amount exceeds $75,000.00.

166.    Pursuant to Idaho Code §18-7805, Plaintiffs are entitled to judgment against the Defendants, jointly and severally, for all such damages, trebled, together with costs and attorney fees.

167.    Pursuant to Idaho Code §18-7805, Plaintiffs are entitled to a decree divesting the Defendants of any interest or profits derived from the racketeering enterprise and prohibiting the Defendants from engaging in the described activity in the future.

## SEVENTH CLAIM FOR RELIEF
## (RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") – 18 U.S.C. §1961-1985)

168.    Plaintiffs hereby allege and incorporate by reference all of the paragraphs and allegations set forth above.

169.    Defendants are each persons as the term is defined by 18 U.S.C. §1962.

170.    Collectively, Defendants formed and participated in an ongoing enterprise or association in fact as that term is defined by 18 U.S.C. §1961.

171.    The Defendants were members of and/or associated with the ongoing enterprise, which occurred within, and the activities of which, affected interstate commerce.

172.    The Defendants' conduct, as identified herein, was unlawful, fraudulent, and engaged in the interstate transportation of stolen property by knowing causing and inducing the wiring of Plaintiffs' funds across state lines to Defendants' bank.   Defendants further used interstate communications to make false representations as outlined herein to Plaintiffs and to perpetrate fraud upon Plaintiffs.   Defendants used this scheme, or a similar scheme, to defraud other companies and franchisees.

173.    Each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs by managing or participating in the operation of the enterprise through the previously described pattern of racketeering activities.

174.    The Defendants' conduct caused injury to Plaintiffs' business and property in an amount to be determined at trial, but which amount exceeds $75,000.00.

175.    Plaintiffs are entitled to judgment against the Defendants, jointly and severally, for all such damages, trebled, together with costs and attorney fees.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and award the following relief:

1.    An award of general and special damages, along with costs and attorney fees, resulting from the Defendants' breach of contract;

2.    An award of general and special damages resulting from the Defendants' fraud;

3.  An award of general and special damages resulting from the Defendants' tortious interference with contract;

4.  An award of general and special damages resulting from the Defendants' breach of the covenant of good faith and fair dealing;

5.  An award of general and special damages resulting from the Defendants' unjust enrichment;

6.  An award of trebled damages, along with costs and attorney fees, resulting from the Defendants' violations of 18 U.S.C. §1962;

7.  An award of trebled damages, along with costs and attorney fees, resulting from the Defendants' violations of Idaho Code §18-7804;

8.  An award of costs and attorney fees as permitted by Idaho and Federal law;

9.  Any such further relief, equitable or at law, as justice allows.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**


Dated this 6th day of June, 2016.

**STRINDBERG & SCHOLNICK, LLC**


/s/ T. Guy Hallam, Jr.
Attorneys for Plaintiffs